```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TENNESSEE
                       WESTERN DIVISION
```

| | |
|---|---|
| DERRY LOVINS, | ⁄ |
| | ⁄ |
|     Petitioner, | ⁄ |
| | ⁄ |
| vs. | ⁄     No. 08-2706-JPM-tmp |
| | ⁄ |
| TONY PARKER, | ⁄ |
| | ⁄ |
|     Respondent. | ⁄ |
| | ⁄ |

```
     ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT
       ORDER DENYING PETITION PURSUANT TO 28 U.S.C. § 2254
                        ORDER OF DISMISSAL
             ORDER DENYING CERTIFICATE OF APPEALABILITY
            ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH
                               AND
       ORDER DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL
```

On October 3, 2008, Petitioner Derry Lovins, Tennessee Department of Correction prisoner number 226346, an inmate at the Northwest Correctional Complex in Tiptonville, Tennessee, filed a pro se petition pursuant to 28 U.S.C. § 2254. (Docket Entry ("D.E.") 1.) Petitioner paid the habeas filing fee on October 22, 2008. (D.E. 2.) The Court issued an order on January 8, 2009, that, inter alia, directed Respondent to file the state-court record and a response to the petition. (D.E. 3.)

On March 4, 2009, Respondent filed a motion to dismiss and, on March 5, 2009, he filed the state-court record. (D.E. 8 &

10.) On April 6, 2009, the Clerk docketed Petitioner's "Motion in Opposition to Respondent's Motion to Dismiss" (D.E. 12), which, although titled a motion, is actually a response to the motion to dismiss. On June 15, 2009, Petitioner filed a motion seeking judgment on the pleadings. (D.E. 13.) The Court issued an order on February 3, 2010, that, <u>inter alia</u>, denied Petitioner's motion for judgment on the pleadings, denied Respondent's motion to dismiss, and directed Respondent, for the second time, to file the complete state-court record. (D.E. 16.)

On March 31, 2010, Respondent filed a motion for summary judgment (D.E. 17), accompanied by the remainder of the state-court record (D.E. 18). Petitioner has not responded to the summary judgment motion, and the time for a response has expired.

I.   <u>STATE COURT PROCEDURAL HISTORY</u>

On February 11, 2002, Lovins was indicted for the first degree murder of Geoffrey A. Burnett. (D.E. 10-1 at 6.) On August 22, 2002, following a jury trial in the Circuit Court for Dyer County, Tennessee, Lovins was convicted of second degree murder. (D.E. 10-5 at 106.) At a sentencing hearing on September 17, 2002, Lovins was sentenced to a term of imprisonment of twenty-three (23) years at 100%. (D.E. 10-1 at 8; D.E. 10-6.) The Tennessee Court of Criminal Appeals affirmed. <u>State v. Lovins</u>, No. W2003-00309-CCA-R3-CD, 2004 WL 224482 (Tenn. Crim. App. Feb. 4, 2004 (D.E. 10-11), <u>perm. app. denied</u> (Tenn. Mar. 5, 2007).

2

On February 18, 2005, Lovins filed a <u>pro se</u> petition pursuant to the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122, in the Dyer County Circuit Court. (D.E. 10-13 at 30-38.) Counsel was appointed to represent Petitioner (<u>id.</u> at 39), and an amended petition was filed on March 30, 2005 (<u>id.</u> at 41-43). The postconviction court conducted a hearing on September 14, 2005 (D.E. 10-14) and, on June 2, 2005, issued an order denying the petition (D.E. 10-13 at 48-56).[1] The Tennessee Court of Criminal Appeals affirmed. <u>Lovins v. State</u>, No. W2005-01446-CCA-R3-PC, 2007 WL 2700097 (Tenn. Crim. App. Sept. 14, 2007) (D.E. 10-19), <u>perm. app. denied</u> (Tenn. Feb. 25, 2008).

On April 14, 2008, Petitioner filed a Motion to Recall the Mandate in the Tennessee Supreme Court, in which he sought extraordinary review of the portion of the decision of the Tennessee Court of Criminal Appeals that addressed <u>Blakely v. Washington</u>, 542 U.S. 296 (2004). (D.E. 18-2.) On April 14, 2008, Petitioner also filed an Application for Extraordinary Appeal in the Tennessee Supreme Court. (D.E. 18-3.) The Tennessee Supreme Court issued an order on April 21, 2008, denying Petitioner's

---

[1]      In an order issued on November 3, 2006, the Tennessee Court of Criminal Appeals held that the trial court erred in denying Petitioner a delayed appeal to the Tennessee Supreme Court. The appellate court ordered that Petitioner be allowed to seek permission to appeal on a delayed basis and stayed action on the remainder of the postconviction petition pending that application. <u>Lovins v. State</u>, No. W2005-01446-CCA-R3-PC (Tenn. Crim. App. Nov. 3, 2006) (D.E. 18-1). The Tennessee Supreme Court denied permission to appeal the decision on direct appeal on March 5, 2007.

motion to recall the mandate and dismissing the application for an extraordinary appeal. (D.E. 18-4.)

To assess the claims raised by Lovins in this petition, it is necessary briefly to set forth the facts, as found by the Tennessee Court of Criminal Appeals:

> The following evidence was presented at the Defendant's trial: Ashunn Harris testified that he knew the Defendant for about three or four years and knew the victim, Geoffrey Burnett, for about one year at the date of the killing, December 4, 2001. Harris testified that he was outside of his home, which was in close proximity to the murder scene, and noticed that the Defendant drove by his house in a green minivan four or five times during the day. Harris stated that both he and the victim were outside Harris house together when the Defendant drove by in his minivan. Harris testified that he and the victim left Harris house at 6:00 or 6:30 p.m. and that, when they left, it was dark outside. Harris stated that he and the victim left Harris house in the victim's car and that the victim was driving while Harris sat in the front passenger's seat. Harris testified that he and the victim picked up James "Splat" Barr, who got in the victim's vehicle and sat behind Harris. Harris stated that he did not see a gun in the vehicle.
>
> Harris said that the three men were headed back to Harris house when they noticed the green minivan the Defendant was driving earlier. Harris stated that both cars stopped at a stop sign and rolled down the windows, and the victim and the Defendant "exchanged words." Harris stated that the Defendant asked the victim for "some change" and the victim said that "he didn't have [any] change for him...." Harris testified that the two kept repeating these words with raised voices and the Defendant again asked the victim for "change" and the victim said, "The only way you're go[ing to] get the change is [if] you put a bullet in my head." Harris testified that, after the victim made this statement, he heard the Defendant's door open and then heard one shot, after which Harris "got down," and then he heard another shot. Harris stated that right after the shots were fired he heard the minivan pull away "real fast."

Harris stated that when he raised his head back up he noticed that the victim was "laid out" and bleeding. Harris opened his door, the window of which was "busted out," and ran and called an ambulance. Harris stated that he did not see a gun in the victim's possession at any time.

On cross-examination, Harris stated that, immediately prior to the shooting, the victim "was about to open the door. He had cracked it open a little bit." Harris testified that he did not see the Defendant make any gesture towards the victim prior to the victim opening his car door. Harris also agreed that it was common knowledge in the community that the victim had acted violently towards other people in the past. Harris stated that he heard about an incident in November 2001 when the victim went into an apartment and shot someone.

Billy-Buck [sic], an officer with the Dyersburg Police Department, testified that he was on patrol on December 4, 2001, and was the first officer to arrive on the scene of this shooting. The officer stated that, when he got to the scene, several people were surrounding the vehicle and the passenger window of the car was "shot out." The officer stated that blood covered the victim's face and it was apparent that he suffered a "serious wound." The officer stated that the passenger's side door was open and the driver's side door was shut. The officer stated that he checked the victim's car for weapons and did not find a gun, but he did find a cell phone in the victim's hand. The officer said that there were no passengers in the victim's car when he arrived. Officer Buck stated that the Defendant called the police department shortly after the shooting and reported that someone was chasing him in a vehicle. The officer noted that the description given by the Defendant matched the victim's vehicle, which was parked at the scene of the shooting.

On cross-examination, the officer admitted that he did not see any passengers in the vehicle when he got to the crime scene and that it was possible that either passenger could have removed items from inside the car, including a weapon, when they left.

Jim Gray, an investigating officer with the Dyersburg Police Department, testified that on December 4, 2001, he received a call to investigate a shooting.

The officer stated that, when he arrived at the scene, he saw a maroon Pontiac with the victim inside. Officer Gray stated that there was a bullet hole in the center of the driver's side door, which was closed. The officer stated that the driver's side window was rolled down and the passenger's side door was open and the glass in the window was broken. The officer testified that he did not see any weapon in the victim's car but that he did see a cell phone lying in the victim's lap.

Officer Gray testified that he heard from the dispatcher that the Defendant advised the police that he had been in an altercation and shooting. The officer testified that he found the van that the Defendant was driving during the shooting and, after searching it, found three .357 live rounds and one glove. The officer testified that his investigation revealed that there were four men in the minivan with the Defendant at the time of the shooting: Josh Garrett, Dennis Akins, Billy Thompson, Jr., and Anthony Gooch.[2] The officer testified that he also determined that there were two men in the car with the victim at the time of the shooting: James Barr and Ashunn Harris. On cross-examination, Officer Gray testified that the bullet hole in the door was about three or four feet below the victim's head.

Cynthia Gardner, an employee with the medical examiner's office, testified that she examined the victim's body and swabbed the victim's hands for gunshot residue. Gardner testified that the victim's gunshot wound was located just above his left ear. Gardner stated that, from the entrance wound, she determined that the gun was more than two feet away from the victim at the time that it was fired. Gardner determined that when the victim was shot he was looking straight ahead, and the bullet came from a perpendicular direction, entering the side of the victim's head.

Laura Hodge, a special agent forensic scientist for the Tennessee Bureau of Investigation, testified that the gunshot residue test performed on the victim was negative, indicating that there was no gunshot residue on the victim's hands.

---

[2]     The Tennessee Court of Criminal Appeals clarified, in a footnote, that "[t]here was some confusion as to whether this man's name was Anthony Gooch or Anthony Williams." State v. Lovins, 2004 WL 224482, at *2 n.1.

John David Fisher, a bail bondsman, testified that he was familiar with the Defendant. Fisher stated that the Defendant called him at around one o'clock on the afternoon prior to the murder to ask if Fisher would be in town that evening because "he thought there may be a little trouble and just might need to make bond." Fisher testified that the Defendant told him that he might get in trouble for an assault and would call him if he needed him. Fisher stated that the Defendant called him later that day, around six or seven o'clock in the evening, and told him that he was on his way to turn himself in because someone had been shot.

On cross-examination, Fisher stated that the Defendant rented property from Fisher and that some of that property was subleased to the victim. Fisher testified that he was due some rent money on the property that was subleased by the victim. Fisher also stated that the Defendant told him that he was going to the police station because he had shot someone's door, but that he did not use the words murder or homicide.

Mark Reynolds, an officer with the Dyersburg Police Department, testified that he was called to the shooting scene on December 4, 2001, and that he tried to locate any witnesses among the people gathered there. Officer Reynolds testified that, later in the investigation, he learned that Josh Garrett was a passenger in the Defendant's minivan at the time of the shooting. Garrett took the officer to a location where Garrett said he disposed of the murder weapon, and, there, the officer located a .357 handgun in a ditch. Officer Reynolds stated that the gun had one spent round in the chamber and that he found a "live" cartridge on the road near where the weapon was found.

Billy Williams, an officer with the Dyersburg Police Department, testified that he was called to assist in investigating the shooting. Officer Williams stated that he interviewed the Defendant at eight o'clock on the evening of the shooting. The officer testified that he noticed that the Defendant was "very upset, very nervous, and just basically ... shaken up." The officer informed the Defendant of his Miranda rights, after which the Defendant told the officer that "he had been into it with [the victim]" and that he stopped his minivan next to the victim's car and words were exchanged. The officer stated that the Defendant told him that he was asking the victim

for money and that the victim said, "The only way you'll get some money out of me is to shoot me in the head." Officer Williams testified that the Defendant stated that he thought the door was about to open "or he saw [the victim] move, and he fired two shots" and then "sped off." The officer stated that the Defendant told him that he never saw the victim with a gun.

The officer testified that the Defendant told him that Josh Garrett and Billy Thompson, Jr., were in the car with him at the time of the shooting. Officer Williams testified that Garrett told him that Garrett had a 9-millimeter handgun, and the investigation also revealed that the Defendant had a weapon. The officer testified that, once Garrett was released, he retrieved his 9 millimeter gun and turned it into the police. On cross-examination, the officer stated that he knew from the beginning of the investigation that there was an allegation that the victim began to open his door prior to the shooting. The officer also admitted that the Defendant told him that the victim's car "cut us off" prior to the two cars stopping at the stop sign and that the Defendant told him that there were two guns, "a 9 [millimeter] and a .357," in the car at the time of the shooting. Officer Williams testified that the Defendant told him that he saw the victim reach for something prior to the shooting. The officer testified that the Defendant told him that the victim was making threats to his life. The officer also stated that he was aware that two Dyersburg residents complained to police that the victim broke into their apartment and threatened them with a gun on December 12, 2000. Officer Williams testified that he knew the victim's mother because she was an officer with the Ripley Police Department.

The Defendant called Tammy Denise Smith who testified that she knew the Defendant from a business that he owned and operated. Smith testified that she also knew the victim for approximately two years prior to his death. Smith stated that the victim told her on the day of the murder that, when he found the Defendant, he was going to kill him. She testified that the victim had a reputation for violence in the community. Smith testified that she told the Defendant that she heard the victim threaten the Defendant's life. Smith stated that, on one occasion, she saw the victim pull a gun on the Defendant's brother and "just poin[t] the gun at him...." On cross-examination, Smith admitted that she did not

mention her conversation with the victim, in which he
threatened the Defendant's life, when she testified on
the Defendant's behalf at any previous hearings.

Natasha Spain, the victim's girlfriend, testified
that she knew the Defendant and that she was living with
the victim at the time of his death. Spain testified that
she was working at the time of the murder and that the
victim had driven her to work. She stated that the victim
told her on the day of the murder that he was going to go
to Ripley and get a gun, and Spain understood the victim
to mean that he was going to get the gun "to take care of
a problem" that he was having with the Defendant. Spain
stated that she told the victim to stay away from the
Defendant. On cross-examination, Spain admitted that,
shortly after the murder, she told investigators that the
Defendant called her prior to the shooting, while she was
with the victim, and asked her to "[p]ut your b* * * * a*
* n* * * * on the phone," referring to the victim. She
stated that the victim spoke with the Defendant, who was
asking the victim for money, and he told the Defendant to
subtract the money that he owed the Defendant from the
money the Defendant owed him and then inform him of the
balance.

Kim Floyd testified that she told the Defendant that
the victim was a violent and dangerous person prior to
the night of the shooting.

Billy Ray Thompson testified that he was a passenger
in the minivan driven by the Defendant on the night of
the shooting. He testified that he was sitting behind the
driver in the back seat and that, in addition to the
Defendant, two other men, Josh Garrett and Dennis Akins,
were in the minivan. Thompson testified that the
Defendant did not mention the victim while they were in
the car together prior to the shooting. Thompson stated
that they saw the victim's car at a four-way stop and
that the Defendant backed the van up to the victim's car
and the two men started talking. He said that the
Defendant asked the victim for money and the victim
responded, "If you can do your math, then you would know
that I don't owe you [anything]," and the victim got
upset and "started hollering." Thompson stated that the
Defendant was not upset at all. Thompson testified that
he saw the victim reaching "on the side of him like he
was [getting ready to] get a gun." Thompson said that the
victim opened his driver's side door halfway and looked

as if he was going to get out of his car. Thompson testified that he thought that the victim was about to "talk crazy, or shoot at us, or something." He testified that the victim previously "pulled a gun" on him one week prior to the shooting.

On cross-examination, Thompson testified that he heard the victim tell the Defendant, "To get your money, you're go[ing to] have to put one in my head" and that, shortly thereafter, he heard two gunshots and the Defendant drove away. Thompson stated that the Defendant fired the gun. Thompson stated that the Defendant then immediately called the police and said, "I just shot someone and I need for y'all to come meet me on the highway because he's still chasing me."

The Defendant next called Officer Jim Gray to testify again. Officer Gray stated that, when he examined the victim's vehicle at the crime scene, it was in park. The officer testified that the bullet hole in the driver's side door was significantly lower than where the victim's torso would have been located had he been sitting behind the steering wheel.

Carey Brown Haynes testified that he was familiar with both the Defendant and the victim. Haynes testified that the victim shot him in the left ear and the head and that the Defendant was aware of this. Haynes stated that, when the victim shot him, he was sitting at his house and the victim "came and kicked in the door of the house" and then shot him. On cross-examination, Haynes testified that he told the police that the victim shot him.

Officer Billy Williams was called again to testify and stated that he interviewed Haynes when Haynes was shot on December 12, 2000. He stated that Haynes never told him that the victim shot him, and only told him that the individual who shot him had on a mask and that Haynes did not know who that individual was. Officer Williams stated that, during the investigation, the victim was a possible suspect and was interviewed, but there was insufficient evidence to charge him with the crime. The officer stated that when Haynes was shot he was living with both the Defendant and the victim. Officer Williams testified that he did not execute a search warrant in that case and denied that it was because he had a good working relationship with the Defendant's mother.

10

The Defendant testified on his own behalf that he owned and operated a business named Auto Source for several years and that he owned it on the day of the shooting. The Defendant testified that he knew the victim for approximately three years prior to the shooting. The Defendant stated that, prior to the shooting, the victim was "having words and disagreements" with at least six of their mutual acquaintances. The Defendant testified that, before the shooting, he learned from "quite a few people" that the victim was making threats against his life. Specifically, the Defendant was told that the victim said, "If he s[aw] me, he was go[ing to] kill me." The Defendant testified that these threats concerned him and he felt that the victim really was going to kill him. The Defendant said that, on the day of the shooting, Tammy Smith told him that the victim told her that the victim was going to kill the Defendant. The Defendant testified that he had been told that the victim was involved in previous shootings.

The Defendant testified that, on the night of the murder, the victim's vehicle was blocking his vehicle and that he put his vehicle in reverse. The Defendant said that the victim then backed up the victim's vehicle so that the two cars were side by side. The Defendant testified that, after the victim blocked his car, the Defendant knew there was "going to be trouble." The Defendant testified that the victim asked him, "What's up" and did not appear "upset or anything." The Defendant stated that he wanted to see what was "going on" because people had been telling him that the victim was going to try to kill him, but he had seen the victim multiple times that evening and he did not attempt to stop the Defendant. The Defendant stated that the victim then "got real upset" but that he did not know why. He testified that the victim did not say anything about putting a bullet in the victim's head as the other witness said but said that there was "go[ing to] be some killin[g]."

The Defendant stated that the victim appeared to be excited and "started reachin[g]" for a gun, so the Defendant reached for his gun. The Defendant stated that he never saw a gun in the victim's hand but knew that he regularly carried a weapon. The Defendant stated that, after he reached for his gun, the Defendant immediately fired a shot and, as he was driving off, he fired another shot. He said that he fired his gun at the victim just to warn him and that he did not know that the victim had

11

been shot when he drove away. The Defendant testified that he then called the police and told them that he thought that he might have shot someone and that someone might still be following him. The Defendant said that he told police that he had two guns in the minivan and that he left the guns in the minivan. The Defendant stated that he carried a gun with him because he often carried large sums of money from his store.

On cross-examination, the Defendant stated that he and the victim formerly lived in close proximity to each other. The Defendant stated that, five days prior to the murder, he and the victim drove to Jackson, Tennessee, together and did not have any problems. The Defendant testified that, on the day of the murder, he picked up his cousin, Josh Garrett, and that Garrett had a gun "on him." The Defendant stated that the two men saw the victim a couple of times while driving around and, since the victim did not stop them, they assumed that there was not going to be a problem, so they placed both guns on the floor of the minivan. The Defendant testified that, when he and the victim were in their respective vehicles next to each other, the victim stated that he did not have a problem with the Defendant and then told the Defendant that he was friends with Officer Williams and could not get in trouble. The Defendant stated that, during this time, he "wasn't saying a word." The Defendant admitted that there was some discussion about money, stating, "I asked him about the money after he was starting to get riled up."

The Defendant stated that he asked the victim for money because "[a]t that point in time, I didn't think he had a gun." The Defendant testified that the victim then said "something about some kill[ing]" and the victim reached down inside his car. The Defendant stated that the victim put his cell phone on the dash, put the car in park, opened the door and was reaching down when the Defendant fired the first shot. The Defendant explained that he did not know where the victim was when he fired the second shot because he was driving off as he fired it. The Defendant testified that he did not know if there was anything that prevented him from driving off prior to shooting the victim. The Defendant stated that, when he left the scene of the shooting, he drove the opposite direction from the sheriff's department. The Defendant testified that he left the minivan and asked someone to come pick him up because he thought that someone was

following the minivan. He stated that he left his cousin
and another man in the minivan and that he left the guns
in the minivan.

The State called one rebuttal witness, Rita M.
Burnett, who was the victim's mother and is an officer
with the Ripley Police Department. Officer Burnett
testified that she had known Officer Williams since 1999
and that he called her one time because her son, the
victim, was implicated in a shooting. Officer Burnett
stated that she has four sons, two of whom are in prison,
the victim, and a fifteen year old son. The officer
testified that the victim would "physically figh[t]," but
that she had never known him to be charged with using a
weapon.

Based upon this evidence, the jury convicted the
Defendant of second degree murder, as a lesser-included
offense of premeditated first degree murder.

State v. Lovins, 2004 WL 224482, at *1-*7 (alterations in

original).

II.  PETITIONER'S FEDERAL HABEAS CLAIMS

In this federal habeas petition, Lovins raised the

following issues:

1.  Whether he was denied his right to a jury trial, in
violation of the Sixth Amendment;

2.  Whether he was denied his Sixth Amendment right to
offer testimony and his Fourteenth Amendment right
to due process when Kim Floyd was not allowed to
testify about the victim's involvement in a
shooting at her apartment that resulted in the
death of her daughter;

3.  Whether he was denied his Sixth Amendment right of
compulsory process when the trial court precluded
James "Splat" Barr from testifying;

4.  Whether the State withheld material exculpatory
evidence; and

    5.   Whether his trial counsel rendered ineffective
         assistance, in violation of the Sixth Amendment.

(D.E. 1 at 5-25.)

III.  <u>ANALYSIS OF THE MERITS</u>

    A.   <u>Waiver and Procedural Default</u>

         Twenty-eight U.S.C. § 2254(b) states, in pertinent part:

    (1)  An application for a writ of habeas corpus on
         behalf of a person in custody pursuant to the
         judgment of a State court shall not be granted
         unless it appears that-

         (A)  the applicant has exhausted the remedies
              available in the courts of the State;  or

         (B)  (i)  there is an absence of available State
                   corrective process;  or

              (ii) circumstances exist that render such
                   process ineffective to protect the rights
                   of the applicant.

    (2)  An application for a writ of habeas corpus may be
         denied on the merits, notwithstanding the failure
         of the applicant to exhaust the remedies available
         in the courts of the State.

Thus, a habeas petitioner must first exhaust available state

remedies before requesting relief under § 2254. <u>E.g.</u>, <u>Granberry v.</u>

<u>Greer</u>, 481 U.S. 129, 133-34 (1987); <u>Rose v. Lundy</u>, 455 U.S. 509,

519 (1982); Rule 4, Rules Governing Section 2254 Cases in the

United States District Courts ("Section 2254 Rules"). A petitioner

has failed to exhaust his available state remedies if he has the

opportunity to raise his claim by any available state procedure. 28

U.S.C. § 2254(c); <u>Preiser v. Rodriquez</u>, 411 U.S. 475, 477, 489-90

(1973).

14

To exhaust his state remedies, the petitioner must have presented the very issue on which he seeks relief from the federal courts to the courts of the state that he claims is wrongfully confining him. <u>Picard v. Connor</u>, 404 U.S. 270, 275-76 (1971); <u>Rust v. Zent</u>, 17 F.3d 155, 160 (6th Cir. 1994). "[A] claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief." <u>Gray v. Netherland</u>, 518 U.S. 152, 162-63 (1996). "'[T]he substance of a federal habeas corpus claim must first be presented to the state courts.'" <u>Id.</u> at 163 (quoting <u>Picard</u>, 404 U.S. at 278). A habeas petitioner does not satisfy the exhaustion requirement of 28 U.S.C. § 2254(b) "by presenting the state courts only with the facts necessary to state a claim for relief." <u>Id.</u>

Conversely, "[i]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court." <u>Id.</u> When a petitioner raises different factual issues under the same legal theory, he is required to present each factual claim to the highest state court in order to exhaust his state remedies. <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999); <u>see also</u> <u>Pillette v. Foltz</u>, 824 F.2d 494, 496 (6th Cir. 1987). He has not exhausted his state remedies if he has merely presented a particular legal theory to the courts without presenting each factual claim. <u>Pillette</u>, 824

F.2d at 497-98. The claims must be presented to the state courts as a matter of federal law. "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." Anderson v. Harless, 459 U.S. 4, 6 (1982); see also Duncan v. Henry, 513 U.S. 364, 366 (1995) (per curiam) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

The state court decision must rest primarily on federal law. Coleman v. Thompson, 501 U.S. 722, 734-35 (1991). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, the petitioner ordinarily is barred by this procedural default from seeking federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 87-88 (1977). However, a federal claim may be properly exhausted even if the state-court decision does not explicitly address it; it is enough that the petitioner's brief squarely presents the issue. Smith v. Digmon, 434 U.S. 332 (1978) (per curiam); see also Baldwin v. Reese, 541 U.S. 27, 30-32 (2004) (a federal habeas claim is fairly presented to a state appellate court only if that claim appears in the petitioner's brief).

16

When a petitioner's claims have never been actually presented to the state courts but a state procedural rule prohibits the state court from extending further consideration to them, the claims are deemed exhausted, but procedurally barred. <u>Coleman</u>, 501 U.S. at 752-53; <u>Teague v. Lane</u>, 489 U.S. 288, 297-99 (1989); <u>Wainwright</u>, 433 U.S. at 87-88; <u>Rust</u>, 17 F.3d at 160.

A petitioner confronted with either variety of procedural default must show cause for the default and that he was prejudiced in order to obtain federal court review of his claim. <u>Teague</u>, 489 U.S. at 297-99; <u>Wainwright</u>, 433 U.S. at 87-88. Cause for a procedural default depends on some "objective factor external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule. <u>Coleman</u>, 501 U.S. at 752-53; <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986).

A petitioner may avoid the procedural bar, and the necessity of showing cause and prejudice, by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750. The petitioner must show that "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995) (quoting <u>Murray</u>, 477 U.S. at 496). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." <u>Id.</u>

17

The conduct of Lovins' postconviction proceeding was governed by Tennessee's Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122. That act specifies types of procedural default that might bar a state court from reviewing the merits of a constitutional claim:

> Upon receipt of a petition in proper form, or upon receipt of an amended petition, the court shall examine the allegations of fact in the petition. If the facts alleged, taken as true, fail to show that the petitioner is entitled to relief or fail to show that the claims for relief have not been waived or previously determined, the petition shall be dismissed. The order of dismissal shall set forth the court's conclusions of law.

Id. at § 40-30-106(f).[3]

A state court determination that a claim has been previously determined does not bar federal review; rather, "it provides strong evidence that the claim has already been given strong consideration by the state courts and thus is ripe for

---

[3]   Tenn. Code Ann. § 40-30-106 continued:

(g)   A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:

(1)   The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or

(2)   The failure to present the ground was the result of state action in violation of the federal or state constitution.

(h)   A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

federal adjudication." <u>Cone v. Bell</u>, 129 S. Ct. 1769, 1781 (2009).
A federal court is required to scrutinize the application of state-court rules that are invoked to bar a federal court from reviewing a habeas petitioner's claim, <u>id.</u> at 1782 (citing <u>Lee v. Kemna</u>, 534 U.S. at 362, 375 (2002)), and, when a state court declines to find that a claim has been waived by a petitioner's alleged failure to comply with a procedural rule, a federal court ordinarily will not second-guess that decision, <u>id.</u>

The Sixth Circuit has upheld the dismissal of a Tennessee prisoner's habeas petition as barred by a procedural default caused by failing to file within the Tennessee statute of limitations on postconviction relief. <u>Hannah v. Conley</u>, 49 F.3d 1193, 1194-95 (6th Cir. 1995) (construing pre-1995 statute and stating "the language of Tenn. Code Ann. § 40-30-102 is mandatory"). In this case, the prisoner's right to file any further state postconviction petition is barred by the one-year statute of limitations and, therefore, he does not have the option of returning to state court to exhaust any claim presented in this § 2254 petition.

B.   <u>Legal Standard for Merits Review</u>

The standard for reviewing a habeas petitioner's constitutional claims on the merits is stated in 28 U.S.C. § 2254(d). That section provides:

> An application for a writ of habeas corpus on behalf of
> a person in custody pursuant to the judgment of a State
> court shall not be granted with respect to any claim that

was adjudicated on the merits in State court proceedings
unless the adjudication of the claim–

(1)   resulted in a decision that was contrary to, or
      involved an unreasonable application of, clearly
      established Federal law, as determined by the
      Supreme Court of the United States;  or

(2)   resulted in a decision that was based on an
      unreasonable determination of the facts in light of
      the evidence presented in the State court
      proceeding.

This Court must determine whether the state court adjudications of
the claims that were decided on the merits were either "contrary
to" or an "unreasonable application of" "clearly established"
federal law as determined by the United States Supreme Court. This
Court must also determine whether the state court decision with
respect to each issue was based on an unreasonable determination of
the facts in light of the evidence presented in the state
proceeding.

        The Supreme Court has issued a series of decisions
setting forth the standards for applying § 2254(d)(1).[4] In (Terry)
Williams v. Taylor, 529 U.S. 362, 404 (2000), the Supreme Court
emphasized that the "contrary to" and "unreasonable application of"
clauses should be accorded independent meaning. A state-court
decision may be found to violate the "contrary to" clause under two
circumstances:

        A state-court decision will certainly be contrary to our
        clearly established precedent if the state court applies

_____

        [4]   By contrast, there is little case law addressing the standards for
applying § 2254(d)(2).

a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent. Accordingly, in either of these two scenarios, a federal court will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's "contrary to" clause.

Id. at 405-06 (citations omitted); see also Price v. Vincent, 538 U.S. 634, 640 (2003); Lockyer v. Andrade, 538 U.S. 63, 73 (2003); Bell v. Cone, 535 U.S. 685, 694 (2002).[5] The Supreme Court has emphasized the narrow scope of the "contrary to" clause, explaining that "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406; see also id. at 407 ("If a federal habeas court can, under the 'contrary to' clause, issue the writ whenever it concludes that the state court's application of clearly established federal law was incorrect, the 'unreasonable application' test becomes a nullity.").

A federal court may grant the writ under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the

---

[5]   The Supreme Court has emphasized that this standard "does not require citation of our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (emphasis in original).

particular case." <u>Cone</u>, 535 U.S. at 694; <u>see also</u> <u>Andrade</u>, 538 U.S. at 75; <u>Williams</u>, 529 U.S. at 409.[6] "[A]n unreasonable application of federal law is different from an incorrect application of federal law." <u>Williams</u>, 529 U.S. at 410.[7] "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." <u>Id.</u> at 409.[8]

---

[6]    Although the Supreme Court in <u>Williams</u> recognized, <u>in dicta</u>, the possibility that a state-court decision could be found to violate the "unreasonable application" clause when "the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," 529 U.S. at 407, the Supreme Court expressed a concern that "the classification does have some problems of precision." <u>Id.</u> at 408. The <u>Williams</u> Court concluded that it was not necessary "to decide how such 'extension of legal principle' cases should be treated under § 2254(d)(1)," <u>id.</u> at 408-09, and, to date, the Supreme Court has not had occasion to revisit the issue. <u>See Williams v. Coyle</u>, 260 F.3d 684, 699-700 (6th Cir. 2001).

[7]    <u>See also</u> <u>Andrade</u>, 538 U.S. at 75 (lower court erred by equating "objectively unreasonable" with "clear error"); <u>Id.</u> ("These two standards, however, are not the same.  The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002) (per curiam) (holding that the lower court "did not observe this distinction [between an incorrect and an unreasonable application of federal law], but ultimately substituted its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d)"); <u>Cone</u>, 535 U.S. at 698-99 ("For [a habeas petitioner] to succeed . . . , he must do more than show that he would have satisfied <u>Strickland</u>'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied <u>Strickland</u> incorrectly."); <u>Williams</u>, 529 U.S. at 411 ("Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.").

[8]    <u>See also</u> <u>Brown v. Payton</u>, 544 U.S. 133, 147 (2005) ("Even were we to assume the relevant state-court decision applied clearly established federal law erroneously or incorrectly, there is no basis for further concluding that the application of our precedents was 'objectively unreasonable.'") (internal quotations and citations omitted).

Section 2254(d)(1) refers to "clearly established"
federal law, "as determined by the Supreme Court of the United
States." This provision "expressly limits the source of law to
cases decided by the United States Supreme Court." Harris v.
Stovall, 212 F.3d 940, 944 (6th Cir. 2000). As the Sixth Circuit
has explained:

> This provision marks a significant change from the
> previous language by referring only to law determined by
> the Supreme Court. A district court or court of appeals
> no longer can look to lower federal court decisions in
> deciding whether the state decision is contrary to, or an
> unreasonable application of, clearly established federal
> law.

Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1999) (citing 17A
C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure §
4261.1 (2d ed. Supp. 1998)); see also Harris, 212 F.3d at 944 ("It
was error for the district court to rely on authority other than
that of the Supreme Court of the United States in its analysis
under § 2254(d)."). Finally, in determining whether a rule is
"clearly established," a habeas court is entitled to rely on "the
holdings, as opposed to the dicta, of [the Supreme] Court's
decisions as of the time of the relevant state-court decision."
Williams, 529 U.S. at 412.

There is almost no case law about the standards for
applying § 2254(d)(2), which permits federal courts to grant writs
of habeas corpus where the state court's adjudication of a
petitioner's claim "resulted in a decision that was based on an

23

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." In a decision applying this standard, the Supreme Court observed that § 2254(d)(2) must be read in conjunction with 28 U.S.C. § 2254(e)(1), which provides that a state court's factual determinations are presumed to be correct unless rebutted by clear and convincing evidence. <u>Miller-El v. Dretke</u>, 545 U.S. 231, 240 (2005).[9] It appears that the Supreme Court has, in effect, incorporated the standards applicable to the "unreasonable application" prong of § 2254(d)(1). <u>Rice v. Collins</u>, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."). That is consistent with the approach taken by the Sixth Circuit, which stated, in an unpublished decision, that

> a federal habeas court may not grant habeas relief under § 2254(d)(2) simply because the court disagrees with a state trial court's factual determination. Such relief may only be granted if the state court's factual determination was "objectively unreasonable" in light of the evidence presented in the state court proceedings. Moreover . . . , the state court's factual determinations are entitled to a presumption of correctness, which is rebuttable only by clear and convincing evidence.

---

[9]      <u>But cf.</u> <u>Rice v. Collins</u>, 546 U.S. 333, 338-39 (2006) (recognizing that it is unsettled whether there are some factual disputes where § 2254(e)(1) is inapplicable).

<u>Young v. Hofbauer</u>, 52 F. App'x 234, 236 (6th Cir. 2002) (citing 28 U.S.C. § 2254(e)(1));[10] see also <u>Matthews v. Ishee</u>, 486 F.3d 883, 889 (6th Cir. 2007); <u>Stanley v. Lazaroff</u>, 01-4340, 2003 WL 22290187, at *9 (6th Cir. Oct. 3, 2003); <u>Jackson v. Holland</u>, No. 01-5720, 2003 WL 22000285, at *7 (6th Cir. Aug. 21, 2003) ("Though the Supreme Court has not yet interpreted the 'unreasonable determination' clause of § 2254(d)(2), based upon the reasoning in <u>Williams</u>, it appears that a court may grant the writ if the state court's decision is based on an objectively unreasonable determination of the facts in light of the evidence presented during the state court proceeding.") (citing <u>Torres v. Prunty</u>, 223 F.3d 1103, 1107-08 (9th Cir. 2000)).

IV.   <u>ANALYSIS OF PETITIONER'S CLAIM</u>

     A.   <u>Violation of Sixth Amendment (Claim 1)</u>

       In his first issue, Lovins asserts that there was a violation of his Sixth Amendment right to a trial by jury. (D.E. 1 at 5-10.) Specifically, Lovins argues that the trial court should have sentenced him to no more than fifteen (15) years as a Range I offender convicted of second degree murder and that the enhancement of his sentence to twenty-three (23) years violated his right to a jury finding of enhancement factors for sentencing, as set forth in several United States Supreme Court cases post-dating his convictions.

---

[10]   <u>See also</u> <u>Sumner v. Mata</u>, 449 U.S. 539, 546-47 (1981) (applying presumption of correctness to factual determinations of state appellate courts).

As Respondent has noted (D.E. 17-1 at 6), during his sentencing hearing Petitioner raised no objection to the standards employed. When Petitioner was sentenced in 2002, the sentencing judge was required to follow the procedures set forth in Tenn. Code Ann. § 40-35-210 (2000). Lovins was convicted of second degree murder, which is a Class A felony. Tenn. Code Ann. § 39-13-210(c). Pursuant to Tenn. Code Ann. § 40-35-210(c) (2000), "[t]he presumptive sentence for a Class A felony shall be the mid-point of the range if there are no enhancement or mitigation factors." The statute further provides that, "[s]hould there be enhancement but no mitigating factors for a Class A felony, then the court shall set the sentence at or above the midpoint of the range." Id. § 39-13-210(d).

In this case, the sentencing judge found four enhancement factors: (1) Petitioner had a history of criminal convictions or criminal behavior; (2) Petitioner had a history of unwillingness to comply with conditions of a sentence involving release into the community; (3) Petitioner possessed a firearm during the instant offense; and (4) Petitioner had no hesitation about committing the crime when the risk to human life was high. (D.E. 10-6 at 51-52 (applying Tenn. Code Ann. § 40-35-114).) The sentencing court also rejected Petitioner's proposed mitigating factors. (D.E. 10-6 at 52-56.) The sentencing judge concluded that "[t]he presuptive [sic] sentence is a mid-range sentence of 20 years[. W]ith the statements

26

that I have made and the findings that I have made regarding the enhancement factors, and regarding the mitigating factors, the other findings that I have mentioned on the record, I think the appropriate sentence in this case is a 23 years [sic] sentence." (Id. at 56.)

In his motion for a new trial, which was filed on October 15, 2002, Petitioner stated, without elaboration, that "[t]he sentence imposed on the Defendant by the Court was excessive under the facts and circumstances of this case and was not imposed pursuant to the standards set forth in the Tennessee Sentencing Reform Act." (D.E. 10-1 at 10.) At the hearing on the motion, defense counsel argued that,

> [w]e feel like, Judge, with that kind of proof as to self-defense or adequate response to protect your life and lack of any criminal record of Mr. Lovins, the lack of—the fact that he had been employed, had run his business involving auto accessories and apparently was involved in that business at or near the time this occurred, we feel like all those factors, Your Honor, that the Court's—the sentence in this case was excessive based on all the facts and circumstances and the factors, Your Honor, considered.
>
> So we would also ask the Court to consider reducing the sentence in this case to the minimum sentence in this range for the second degree murder conviction as a standard offender. Because, as Your Honor is aware, unlike most—most of the other cases we hear, whatever sentence is ordered to be served by Your Honor will be served at 100% and the only reduction would be for good time, which would mean that the very best that Mr. Lovins could hope for would be to be released at 85% of the twenty-three year sentence. And we just ask Your Honor to consider the lack of any violent, prior violent behavior, any felony behavior at all.

(D.E. 10-8 at 10-11.) The trial judge denied that motion on the merits. (<u>Id.</u> at 17; <u>see also</u> D.E. 10-1 at 12.) Petitioner did not challenge his sentence on direct appeal. (<u>See</u> D.E. 10-9 & 10-11.)

In his amended postconviction petition, which was filed on March 30, 2005, Petitioner argued that "counsel failed to appeal the length of the sentence and the application of enhancing factors" (D.E. 10-13 at 41), but he did not argue that he was sentenced in violation of the Sixth Amendment. The first mention of the Supreme Court's decision in <u>Blakely v. Washington</u>, 542 U.S. 296 (2004), occurred at the postconviction hearing on September 14, 2005, when postconviction counsel stated that "I have a copy of a case that deals with the <u>Blakely</u> case on sentence enhancements" (D.E. 10-14 at 6), and the judge responded that "[t]here's a recent Supreme, Tennessee Supreme Court decision that says that our sentencing act does not violate the constitution" (<u>id.</u>). The judge asked postconviction counsel to list the issues he was raising and, in response, counsel stated that the sentencing enhancements might be invalid under <u>Blakely</u>. (<u>Id.</u> at 11.) Trial counsel testified that the <u>Blakely</u> decision had not been issued when Lovins was sentenced. (<u>Id.</u> at 54-55.) At the conclusion of the hearing, the postconviction court reiterated that "the Tennessee Supreme Court has ruled on that [<u>Blakely</u>] issue and the enhancement under the sentencing act." (<u>Id.</u> at 72.) This conclusion was reiterated in the

written order denying the postconviction petition. (D.E. 10-13 at 52.)

Petitioner raised his <u>Blakely</u> issue in his brief to the Tennessee Court of Criminal Appeals on the denial of the postconviction petition. (D.E. 10-16 at 5, 9.) The Tennessee Court of Criminal Appeals rejected the argument, stating as follows:

> In his next argument, Petitioner contends that his sentence was unconstitutionally enhanced in violation of <u>Blakely v. Washington</u>, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). Petitioner argues that had his sentence been appealed at the time of his direct appeal, which occurred prior to our supreme court's decision in <u>State v. Gomez</u>, 163 S.W.3d 632 (Tenn. 2005), the sentence would have been illegal under <u>Blakely</u> since the enhancement factors were not found by a jury.
>
> In <u>Blakely</u>, the United States Supreme Court concluded that the "'statutory maximum' for <u>Apprendi [v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000),] purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. <u>Blakely</u>, 542 U.S. at 303, 124 S. Ct. at 2537. Subsequent to that decision, our supreme court decided <u>State v. Gomez</u>, in which a majority of the court concluded that, unlike the sentencing scheme in <u>Blakely</u>, "Tennessee's sentencing structure does not violate the Sixth Amendment." <u>Gomez</u>, 163 S.W.3d at 661. However, the United States Supreme Court recently vacated our supreme court's ruling in <u>Gomez</u> and remanded the case for reconsideration in light of its recent decision in <u>Cunningham v. California</u>, 549 U.S. ----, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007). Thus, we no longer follow <u>Gomez</u> given the Supreme Court's instruction. <u>State v. James A. Mellon</u>, No. E2006-00791-CCA-R3-CD, 2007 WL 1319370, *9 (Tenn. Crim. App., at Knoxville, May 7, 2007) (no Tenn. R. App. 11 application filed). In the present case, Petitioner raised the issue in a collateral attack. This Court has previously held that retrospective application of the rule announced in <u>Blakely</u> is not applicable to cases on collateral review. <u>Roy Allen Burch v. State</u>, No. E2004-02365-CCA-R3-PC, 2005 WL 1584379, *2 (Tenn. Crim. App., at Knoxville, July 7,

2005) (no Tenn. R. App. P. 11 application filed) (citing <u>Isaac Lydell Herron v. State</u>, No. W2004-02533-CCA-R28-PC (Tenn. Crim. App., at Jackson, Nov. 22, 2004)). Petitioner is not entitled to relief on this issue.

<u>Lovins v. State</u>, 2007 WL 2700097, at *12.[11]

Petitioner makes no argument that the decision of the Tennessee Court of Criminal Appeals that <u>Blakely</u> is not retroactively applicable to cases on collateral review is contrary to, or an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court. 28 U.S.C. § 2254(d)(1). In <u>Tyler v. Cain</u>, 533 U.S. 656, 662 (2001), the Supreme Court held that a new rule is "made retroactive to cases on collateral review" within the meaning of 28 U.S.C. § 2244(d)(1)(C) only if the Supreme Court holds it to be retroactively applicable to cases on collateral review. The Supreme Court has not held <u>Blakely</u> to be retroactively applicable to cases on collateral review.[12]

---

[11] On April 14, 2008, Petitioner filed a <u>pro se</u> motion with the Tennessee Supreme Court to recall the mandate to permit extraordinary review of the decision of the Tennessee Court of Criminal Appeals that <u>Blakely</u> is not retroactively applicable to cases on collateral review. (D.E. 18-2.) That day, he also filed an application for extraordinary appeal of that portion of the decision of the Tennessee Court of Criminal Appeals that addressed the <u>Blakely</u> issue. (D.E. 18-3.) On April 21, 2008, the Tennessee Supreme Court denied the motion to recall the mandate and dismissed the application for extraordinary appeal, explaining that "[t]here is no interlocutory order in this case from which the petitioner seeks to appeal." (D.E. 18-4.) Because this order did not address the merits of Petitioner's <u>Blakely</u> claim, the Court must look to the decision of the Tennessee Court of Criminal Appeals as the last reasoned decision on the issue. <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 802 (1991).

[12] The Sixth Circuit Court of Appeals has held that <u>Blakely</u> is not retroactively applicable to cases on collateral review. <u>Taniguchi v. United States</u>, 262 F. App'x 714 (6th Cir. 2008); <u>Humphress v. United States</u>, 398 F.3d 855, 860 (6th Cir. 2005).

The first issue is without merit and is DISMISSED.

B.   The limitation of Kim Floyd's testimony (Claim 2)

In his second issue, Petitioner argues that he was denied his Sixth Amendment right to offer testimony, and his Fourteenth Amendment right to due process, when Kim Floyd was not allowed to testify concerning a violent episode involving the victim. (D.E. 1 at 10-13.) Petitioner did not raise this issue on direct appeal (see D.E. 10-9 at 11) or in his postconviction petitions (D.E. 10-13 at 30-38, 41-42). In his amended postconviction petition, Lovins raised an ineffective assistance claim based on his attorney's "fail[ure] to appeal the exclusion of evidence of specific acts of violence committed by the victim that had been communicated to the defendant prior to the alleged crime which would have established the Defendant's fear of the victim during the confrontation immediately preceding the fatal shooting in turn providing justification for Defendant's actions." (Id. at 41.) The postconviction court denied relief (id. at 48, 51), and the Tennessee Court of Criminal Appeals affirmed, stating as follows:

> Petitioner next testified that counsel was ineffective for failing to appeal the exclusion of portions of Kim Floyd's testimony. Specifically, Petitioner said that Ms. Floyd should have been allowed to testify that the victim was involved in a shooting at Ms. Floyd's apartment which resulted in the death of her daughter. He acknowledged that Ms. Floyd did testify at trial regarding the victim's reputation for violence and the fact that she had warned Defendant of this tendency.
> . . .
>
>       . . . .

31

Petitioner's trial counsel testified that he did not appeal the exclusion of Ms. Floyd's testimony because he felt the relevant portions of her testimony were admitted into evidence. Specifically, her testimony was admitted regarding the victim's reputation for violence and the fact that she warned Defendant of this reputation. Trial counsel said the victim's violent nature was "sufficiently clear" from the trial testimony. He explained that the record was replete with testimony from several witnesses who attested to the victim's violent nature, including the victim's girlfriend. He said the girlfriend testified that the victim discussed killing Defendant and purchased a gun on the day of the incident to use in carrying out his plan. Trial counsel said the witnesses were "strong," and the State did not impeach their testimony. . . .

. . . .

Petitioner first claims that trial counsel was ineffective in failing to appeal the exclusion of testimony from Ms. Floyd. Specifically, Petitioner argues that Ms. Floyd should have been permitted to testify that the victim participated in a shooting crime against her which resulted in injury to herself and the death of her two-year-old child. The trial transcript reflects that in a jury-out hearing, Ms. Floyd testified that she told Petitioner that the victim was a violent person who would turn on him. Ms. Floyd told Petitioner she had seen something similar happen eight years earlier when her door was kicked in and "they killed my friend, shot me bad, left me in bad shape and killed my two year old daughter." Ms. Floyd testified that the victim's brother was convicted of the crime, but it was her understanding that the victim was the person who kicked in her door. The trial court permitted the testimony regarding the victim's reputation, but did not allow any evidence of the prior event.

Initially, we note that counsel's choices as to the issues to raise on appeal are generally entitled to substantial deference. Strickland, 466 U.S. 689, 104 S. Ct. at 2065. Our supreme court has stated that counsel on appeal has no obligation to raise every conceivable argument which might be made. Carpenter v. State, 126 S.W.3d 879, 887 (Tenn. 2004) (citing King v. State, 989 S.W.2d 319, 334 (Tenn. 1999)). This Court has further stated that "ineffectiveness is very rarely found in

cases where a defendant asserts that appellate counsel
failed to raise an issue on direct appeal, primarily
because the decision of what issues to raise is one of
the most important strategic decisions to be made by
appellate counsel." <u>Kennath Henderson v. State</u>, No.
W2003-01545-CCA-R3-PD, 2005 WL 1541855, at *44 (Tenn.
Crim. App., at Jackson, June 28, 2005) <u>perm. to appeal
denied</u>, (Tenn. Dec. 5, 2005).

>    The post-conviction court found no evidence that
>    counsel was ineffective in failing to appeal the
>    exclusion of Ms. Floyd's testimony. The court stated that
>    even if counsel's actions were ineffective, Petitioner
>    failed to demonstrate prejudice. We see nothing in the
>    record to preponderate against the trial court's
>    findings. Trial counsel testified that he saw no reason
>    to appeal the exclusion of evidence given the testimony
>    from numerous other witnesses regarding the victim's
>    violent tendencies. Trial counsel found it particularly
>    noteworthy that the victim's girlfriend testified
>    regarding the victim's violent nature and his intention
>    to kill Petitioner. Trial counsel said he thought the
>    evidence that was admitted made it "sufficiently clear
>    how bad [the victim] was." We cannot conclude that
>    counsel's failure to appeal the exclusion of evidence was
>    anything other than reasonable appellate strategy.
>    Furthermore, Petitioner has not shown how he was
>    prejudiced by the exclusion of evidence. As such,
>    Petitioner is not entitled to relief on this issue.

<u>Lovins v. State</u>, 2007 WL 2700097, at *7, *8, *10 (alteration in

original). In this federal habeas petition, Lovins reiterates that

his attorney was ineffective for failing to raise the issue on

direct appeal. (D.E. 1 at 12-13.)

>    Respondent argues that "[t]he claim raised now by the

petitioner was not properly raised before the state courts and

should be considered procedurally defaulted." (D.E. 17-1 at 11.)

Defense counsel raised the issue in the motion for a new trial

(D.E. 10-1 at 40-41; D.E. 10-8 at 5-6), and the trial court denied

the motion, stating that "this witness' testimony was not admissible since there was not sufficient proof that this victim had in fact committed these acts as alleged by this [witness]" (D.E. 10-1 at 12). Petitioner did not raise this issue on direct appeal and, therefore, it is barred by procedural default unless he can show cause and prejudice.[13]

Petitioner argued that the failure to raise the issue on direct appeal was due to the ineffective assistance of counsel. A claim that ineffective assistance of counsel has deprived a habeas petitioner of his Sixth Amendment right to counsel is controlled by the standards stated in Strickland v. Washington, 466 U.S. 668, 687 (1984). Pursuant to Strickland, 466 U.S. at 887:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." Id. at 688.

---

[13]     The petition states that the issue was raised in the motion to recall the mandate and the application for extraordinary appeal (D.E. 1 at 14), but those documents, which were filed on April 14, 2008, raised only Blakely issues.

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Id. at 689 (citations omitted); see also Coe v. Bell, 161 F.3d 320, 342 (6th Cir. 1998) ("The specifics of what Coe claims an effective lawyer would have done for him are too voluminous to detail here. They also largely miss the point: just as (or more) important as what the lawyer missed is what he did not miss. That is, we focus on the adequacy or inadequacy of counsel's actual performance, not counsel's (hindsight) potential for improvement."); Adams v. Jago, 703 F.2d 978, 981 (6th Cir. 1983) ("[A] defendant 'has not been denied effective assistance by erroneous tactical decisions if, at the time, the decisions would have seemed reasonable to the competent trial attorney.'").

A prisoner attacking his conviction bears the burden of establishing that he suffered some prejudice from his attorney's ineffectiveness. See Lewis v. Alexander, 11 F.3d 1349, 1352 (6th Cir. 1993); Isabel v. United States, 980 F.2d 60, 64 (1st Cir.

35

1992). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." <u>Strickland</u>, 466 U.S. at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. <u>See</u> <u>id.</u> at 697.

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> In analyzing prejudice,

> the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of the challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.

<u>Lockhart v. Fretwell</u>, 506 U.S. 364, 368 (1993) (citing <u>United States v. Cronic</u>, 466 U.S. 648, 658 (1984)); <u>see also</u> <u>Strickland</u>, 466 U.S. at 686 ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."). "Thus analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." <u>Lockhart</u>, 506 U.S. at 369.

A criminal defendant is entitled to the effective assistance of counsel on direct appeal. <u>Evitts v. Lucey</u>, 469 U.S. 387, 396 (1985). The failure to raise a nonfrivolous issue on appeal does not constitute <u>per</u> <u>se</u> ineffective assistance of counsel, as "[t]his process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." <u>Smith v. Murray</u>, 477 U.S. 527, 536 (1986) (citation omitted). Claims of ineffective assistance of appellate counsel are evaluated using the <u>Strickland</u> standards. <u>Smith v. Robbins</u>, 528 U.S. 259, 285-86 (2000) (applying <u>Strickland</u> to claim that appellate counsel rendered ineffective assistance by failing to file a merits brief); <u>Smith v. Murray</u>, 477 U.S. at 535-36 (1986) (failure to raise issue on appeal). Thus, to establish that appellate counsel was ineffective in failing to raise an issue, a prisoner

> must first show that his counsel was objectively unreasonable . . . in failing to find arguable issues to appeal—that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them. If [the prisoner] succeeds in such a showing, he then has the burden of demonstrating prejudice. That is, he must show a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal.

<u>Smith v. Robbins</u>, 528 U.S. at 285 (citation omitted).[14]

---

[14]    The Sixth Circuit has articulated a nonexclusive list of factors to consider when assessing claims of ineffective assistance of appellate counsel:

(continued...)

The Tennessee Court of Criminal Appeals concluded that
Lovins failed to show either deficient performance by his appellate
counsel or prejudice. <u>Lovins v. State</u>, 2007 WL 2700097, at *10-*11.
Petitioner has not argued that that decision was contrary to, or an
unreasonable application of, clearly established federal law. The
trial court did not permit Floyd to testify that the victim had
been involved in a shooting at her apartment eight years before
Petitioner killed him because there was insufficient evidence of
his involvement. The victim's brother had been convicted of the
shooting, and the victim was never charged. (D.E. 10-3 at 158-60,
162-63.) At a jury-out hearing, Floyd testified that "Mr. Burnett's

---

[14]    (...continued)
1.    Were the omitted issues "significant and obvious?"

2.    Was there arguably contrary authority on the omitted issues?

3.    Were the omitted issues clearly stronger than those presented?

4.    Were the omitted issues objected to at trial?

5.    Were the trial court's rulings subject to deference on appeal?

6.    Did appellate counsel testify in a collateral proceeding as to
      his appeal strategy and, if so, were the justifications
      reasonable?

7.    What was the appellate counsel's level of experience and
      expertise?

8.    Did the petitioner and appellate counsel meet and go over
      possible issues?

9.    Is there evidence that counsel reviewed all the facts?

10.   Were the omitted issues dealt with in other assignments of
      error?

11.   Was the decision to omit an issue an unreasonable one which
      only an incompetent attorney would adopt?

<u>Franklin v. Anderson</u>, 434 F.3d 412, 429 (6th Cir. 2006) (citing <u>Mapes v. Coyle</u>,
171 F.3d 408, 427-28 (6th Cir. 1999)).

brother took the rap for it, but my understanding is that Mr. Geoffrey was actually the one who kicked my door." (<u>Id.</u> at 163.) Defense counsel stated that he did not have to prove that the victim was actually involved because he was offering the testimony to show Lovins' state of mind. (<u>Id.</u>) The trial judge concluded that Floyd could testify that she told Petitioner that the victim was violent, but she could not testify that she believed the victim was involved in this prior shooting. (D.E. 10-3 at 163-64.) Petitioner makes no argument that the judge's decision regarding the admissibility of Floyd's testimony was incorrect under Tennessee law.

Petitioner also cannot show prejudice due to the fact that Floyd and other witnesses testified about the victim's reputation for violence and Petitioner's knowledge of that reputation. Specifically, Ashunn Harris testified that "it was common knowledge in the community that the victim had acted violently toward other people in the past. Harris stated that he heard about an incident in November 2001 when the victim went into an apartment and shot someone." <u>State v. Lovins</u>, 2004 WL 224482, at *2. Tammy Denise Smith testified that, on the day of the murder, the victim told her that, when he found Lovins, he was going to kill Lovins. <u>Id.</u> at *4. She also testified that the victim had a reputation for violence in the community and that she had told Lovins of the threat on his life made by the victim. <u>Id.</u> Natasha

39

Spain, the victim's girlfriend, testified that, on the day of the murder, the victim was going to get a gun, and the witness understood that to mean that the victim wanted a gun to take care of a problem he was having with Lovins. Id. Carey Brown Haynes testified that, on a prior occasion, the victim kicked in the door of his house and shot him. Id. at *5. Petitioner testified that Floyd had told him that the victim had been involved in a shooting involving Floyd's family. (D.E. 10-4 at 147.) In light of this testimony, Petitioner cannot show that there is a reasonable probability that, if only Floyd had been allowed to testify that she suspected the victim was involved in the shooting at her apartment, the outcome at trial would have been different.

Because Petitioner has not shown ineffective assistance of counsel, he has not established cause for his procedural default. The second issue is without merit and is DISMISSED.

C. The decision not to allow testimony from James "Splat" Barr (Claim 3)

In his third issue, Petitioner contends that he was denied his Sixth Amendment right of compulsory process when the trial court precluded James "Splat" Barr from testifying. (D.E. 1 at 14-17.) Barr was a passenger in the victim's car at the time of the shooting, but he did not appear at trial despite being served with a subpoena. Petitioner asserts that he wanted to ask Barr whether he removed a weapon from the victim's vehicle after the shooting. (Id. at 14-15.) Trial counsel did not ask for a

40

continuance to locate Barr and, consequently, he did not testify at trial. Lovins argues that his trial counsel rendered ineffective assistance by failing to object to the trial judge's refusal to compel Barr to attend the trial. (D.E. 1 at 16.)[15]

In his motion for a new trial, Petitioner's counsel asserted that there was material, newly discovered evidence (D.E. 10-1 at 10) and, at the hearing on the motion, defense counsel stated as follows:

> Your Honor, the only other thing we that we—that we would argue or that we alleged in this motion, . . . paragraph seven of the motion talks about newly discovered evidence. If Your Honor remembers, we've had this case continued I know at least one time about a month and a half ago. Set back I think back in late November because after the trial and conversations with my client at the Dyer County Jail I became aware for the first time, Judge, that there was—an individual had disclosed to Mr. Lovins, maybe an individual that was an inmate, had disclosed to Mr. Lovins that there was talk in the street that an individual by the name of James Barr, alias Splat, who was listed on the indictment as a state witness who, I don't believe was subpoenaed by the state. Was he subpoenaed, do you remember? He was subpoenaed by the state, but did not appear at trial. He was an eye-witness, an alleged eye-witness to the shooting because he was a passenger in the victim's car. The information that my client received and relayed to me is that it was James Barr was the person that actually had taken the billfold of the victim and the gun, or pistol that was inside the victim's car. That he fled the scene. Mr. Barr was not at the scene, I think, was the proof at the time the police arrived to investigate, Your Honor.

---

[15]     As will be shown, this issue, as framed, is factually inaccurate because there is no dispute that trial counsel never asked for a continuance to enable him to locate Barr. The trial judge did not preclude Barr from testifying at trial.

> That would have been, in paragraph seven, that's the
> newly discovered evidence that we were talking about. But
> after several weeks of effort by myself and Mr.—and
> particularly, Your Honor, Mr. Lovins' father, John
> Lovins, we've been unable to secure that affidavit. So,
> at this time we are not able to offer any proof as to, in
> relation to paragraph seven on the grounds of newly
> discovered evidence which would most likely result in a
> different verdict.

(D.E. 10-8 at 8-9.)[16] The trial judge denied this aspect of the new

trial motion because no affidavit concerning the newly discovered

testimony had been submitted. (Id. at 12.) Petitioner did not

pursue the issue on direct appeal.

In his amended postconviction petition, Lovins asserted

that his trial counsel was ineffective for failing to call several

witnesses, including "Robert Barr." (D.E. 10-13 at 41.) At the

hearing, Lovins asserted that his attorney had subpoenaed Barr to

testify at the trial but he did not appear. He contended that his

attorney rendered ineffective assistance in failing to move for a

continuance to locate Barr. (D.E. 10-14 at 19-20.) Trial counsel

testified that he did not recall having subpoenaed Barr and

believed he was subpoenaed by the State. (Id. at 46.) According to

defense counsel:

> I think unbeknownst to the defense or State, [Barr] was
> out of state, maybe in Milwaukee. I do remember that
> Derry and I tried to find ways to get him and we thought

---

[16]     At the hearing, the State represented that "Mr. Barr did not testify
at trial, Your Honor, due to the fact that we attempted to subpoena him and he
had moved out of state and we were not able to serve the subpoena on Mr. Barr."
(Id. at 15.) According to the State, Barr "testified at the preliminary hearing
in this matter when there was a preliminary hearing in Dyersburg City Court. Mr.
Barr testified that he never saw a gun in Burnett's testimony [sic], that he
didn't take a gun from that vehicle." (Id.)

> maybe— We tried to get the State to get him back here.
> The State, we thought the State was gonna have him here.
> Apparently the State couldn't find him either.

(Id.) Counsel testified that, in retrospect, it "would probably have been a good idea" to ask for a continuance. (Id. at 47.) He also conceded, however, that "[w]e don't know what Mr. Barr would have said because nobody got to talk to [him]." (Id.) A transcript of Barr's statement to the police is an exhibit to the postconviction hearing transcript. (D.E. 10-15 at 2-6.) Barr told the police that "[a]s far as I know, Geoffrey Burnett did not have a gun. I did not see a gun. Period." (Id. at 5.) The postconviction court denied relief on this issue, stating that there was no evidence that Petitioner was prejudiced by his attorney's failure to move for a continuance. (D.E. 10-13 at 52.)

The Tennessee Court of Criminal Appeals affirmed, stating as follows:

> Petitioner next argues that trial counsel was ineffective for failing to call Larry Nolen, Joshua Garrett, and James Barr to testify at trial, and failing to request a continuance in order to secure James Barr's presence to testify. . . . Both Mr. Barr and Mr. Garrett's statements were introduced as exhibits at the post-conviction hearing. Petitioner argues that counsel was particularly ineffective in failing to call James Barr to testify. He claims that Mr. Barr removed a gun from the victim's vehicle following the shooting and his testimony in this regard would have supported Petitioner's theory of self-defense. The post-conviction court found that Petitioner failed to demonstrate how he was prejudiced as a result of trial counsel's decision not to call these witnesses and not to request a continuance. The court reviewed Mr. Barr's statement to police and found nothing in the statement that would have been beneficial to Petitioner at trial. . . .

43

We agree with the post-conviction court. . . . With
respect to James Barr, trial counsel stated that a
continuance might have been beneficial to Petitioner's
case provided (1) Mr. Barr could be located and
subpoenaed, and (2) Mr. Barr then testified that he had
taken a gun from the victim's vehicle after the shooting.
At the time of trial, however, Mr. Barr could not be
located, and neither the State nor defense counsel had
reliable information that Mr. Barr could testify to this
effect. Mr. Barr did not testify at the post-conviction
hearing regarding what his trial testimony might have
been. Nor was there any discussion or explanation from
Petitioner as to why Mr. Barr was not called to testify
at the hearing. There is nothing in Mr. Barr's statement,
which was introduced as an exhibit at the post-conviction
hearing, indicating that he removed a gun from the victim
or his car following the shooting. As such, there is
nothing to indicate the outcome of Petitioner's trial
would have been different had Mr. Barr testified. . . .
Without such evidence, we cannot conclude that Petitioner
was prejudiced by trial counsel's failure to call Mr.
Barr or Mr. Nolen. See Black v. State, 794 S.W.2d 752,
757 (Tenn. Crim. App. 1990). . . . Accordingly,
Petitioner is not entitled to relief on this issue.

Lovins v. State, 2007 WL 2700097, at *11.

As Respondent has pointed out (D.E. 17-1 at 12),
Petitioner did not exhaust a claim that his right to compulsory
process had been violated or that the trial court erred in refusing
to allow a continuance.[17] Any such claim is barred by procedural
default unless Petitioner can show cause and prejudice.

Petitioner attempts to establish cause by arguing that
his trial counsel rendered ineffective assistance, but that claim
was rejected by the Tennessee Court of Criminal Appeals. Lovins v.
State, 2007 WL 2700097, at *11. Lovins has not argued that that

---

[17]     The petition states, erroneously, that this issue was raised in the
motion to recall the mandate and application for extraordinary appeal.

decision was contrary to, or an unreasonable application of, clearly established federal law. Specifically, Lovins has presented no evidence that Barr could have been subpoenaed at the time of his trial. He also has presented no evidence that, had Barr been called at trial, he would have testified that he removed a firearm from the victim's car after the shooting. Barr's statement to the police offers strong evidence that he would not have so testified. Therefore, Petitioner has not demonstrated either deficient performance or prejudice.

Because Petitioner has not shown ineffective assistance, there is no cause to overcome the procedural default. The third issue is without merit and is DISMISSED.

D.   The State's alleged withholding of exculpatory evidence (Claim 4)

In his fourth issue, Lovins asserts that "the State withheld a box of physical evidence containing, among other things, a pair of gloves and ammunition which were displayed to the jury during his trial." (D.E. 1 at 17.) Petitioner contends that these items were not produced in discovery, but "the prosecution displayed a pair of gloves to the jury" at trial. (Id. at 17-18.) Petitioner contends that the failure to disclose this evidence violates Brady v. Maryland, 373 U.S. 83, 87 (1963).

At trial, Investigator Jim Gray of the Dyersburg Police Department testified that he recovered "three .357 live rounds, and a pair of gloves, one glove" from Lovins' van. (D.E. 10-2 at 118;

see also id. at 118-21, 133-34.) The box containing the ammunition and the glove was admitted into evidence without objection. (Id. at 120.)

Petitioner raised a Brady issue, with no factual support, in his original postconviction petition (D.E. 10-13 at 34, 35), and the amended postconviction petition alleged that "[t]he prosecution failed to disclose physical evidence prior to trial which was introduced at trial, i.e. a box containing items such as a glove or gloves" (id. at 42). At the postconviction hearing, Petitioner testified that the State did not disclose the gloves and other items in the box during discovery. (D.E. 10-14 at 26-27, 31.) Trial counsel testified that he did not recall any physical evidence. (Id. at 56-58.) The postconviction court denied relief, stating that "Petitioner's next allegation of lack of physical evidence simply lacks any proof to indicate there was any such physical evidence or failure to disclose any such physical evidence prior to trial. The petitioner fails to carry his burden of proof on Issue No. 7." (D.E. 10-13 at 52.) The Tennessee Court of Criminal Appeals affirmed, stating as follows:

> In his next argument, Petitioner contends that he was denied his right to pre-trial disclosure of evidence. Specifically, Petitioner asserts that, during discovery, the prosecution withheld a box of physical evidence containing, among other things, a pair of gloves which were displayed to the jury during his trial. Petitioner contends that the failure to disclose this evidence denied him his constitutional right to a fair trial. Petitioner cites only his own testimony at the post-conviction hearing in support of his argument. Trial

46

> counsel testified that he had no recollection of a box of
> evidence or a pair of gloves. The trial transcript
> reflects that one brown work glove and a box of
> ammunition were recovered from the Petitioner's van. The
> items were introduced as an exhibit at trial. Trial
> counsel affirmed that he had seen the items and did not
> object to their introduction into evidence. The post-
> conviction court found that Petitioner offered no proof
> that the physical evidence existed or that the State
> failed to disclose the alleged evidence prior to trial.
> The evidence does not preponderate against the trial
> court's findings. Petitioner is not entitled to relief on
> this issue.

Lovins v. State, 2007 WL 2700097, at *13.

Respondent argues that "[t]he petitioner again fails to show that the state court decision was contrary to or involved an unreasonable application of clearly established federal law or that the decision was based on an unreasonable determination of facts." (D.E. 17-1 at 15.) Although this statement is correct, it is difficult to review the rather cryptic state-court decision on that basis. The Tennessee Court of Criminal Appeals acknowledged that the trial transcript reflects that a brown work glove and a box of ammunition were recovered from Petitioner's van and introduced into evidence at trial, yet it also adopts the postconviction court's finding that "Petitioner offered no proof that the physical evidence existed." The Tennessee Court of Criminal Appeals also concluded that there was no proof that the evidence had not been disclosed, but does not explain why Petitioner's testimony should be discounted. Trial counsel appeared not to recall the evidence, which is not proof that it was or was not produced in discovery.

47

The State introduced no evidence that it had produced the items in discovery.

In its brief to the Tennessee Court of Criminal Appeals, the State pointed to an exchange between defense counsel and the trial judge as proof that the physical evidence had been disclosed. (D.E. 10-18 at 34-35 (citing D.E. 10-2 at 123).) That exchange occurred at the conclusion of the direct examination of Gray, after the items had been received in evidence. The trial judge asked defense counsel whether he had seen Exhibit 6, and counsel responded in the affirmative. (D.E. 10-2 at 123.) That ambiguous exchange does not appear to refer to discovery but, instead, whether counsel had had the opportunity to view the exhibit before his cross examination of Gray.

Even if it were assumed that the State did not disclose the items, Petitioner has not established a constitutional violation. The Supreme Court held in Brady v. Maryland, 373 U.S. at 87, "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." This duty to disclose "is applicable even though there has been no request by the accused . . . , and . . . the duty encompasses impeachment evidence as well as exculpatory evidence." Strickler v. Greene, 527 U.S. 263, 280 (1999) (citations omitted). A Brady violation has three components:

48

> The evidence at issue must be favorable to the accused,
> either because it is exculpatory, or because it is
> impeaching; that evidence must have been suppressed by
> the State, either willfully or inadvertently; and
> prejudice must have ensued.

Id. at 281-82. To show prejudice, a defendant "must convince [the
Court] that 'there is a reasonable probability' that the result of
the trial would have been different if the suppressed [evidence]
had been disclosed to the defense." Id. at 289.

     In discussing prejudice, the Supreme Court has emphasized
that Brady is intended to protect a defendant's right to a fair
trial. "[T]he term 'Brady violation' is sometimes used to refer to
any breach of the broad obligation to disclose exculpatory
evidence—that is, to any suppression of so-called 'Brady
material'—although, strictly speaking, there is never a real 'Brady
violation' unless the nondisclosure was so serious that there is a
reasonable probability that the suppressed evidence would have
produced a different verdict." Id. at 281 (footnote omitted).

     In this case, there was no a Brady violation because the
evidence was not exculpatory or impeaching. Petitioner testified at
the postconviction hearing that he believes the jury was more
inclined to convict him after viewing the gloves. (D.E. 10-14 at 27
("When we got to trial they brought out a box of stuff and it had
some gloves and other items, but he took the gloves out and was
showing them to the jury and I really think that really had an
effect on them too."), 31 ("It was a box of stuff, but I remember

                                   49

the gloves because I think the gloves had more of an impact than anything.").) Petitioner appears to have the mistaken belief that <u>Brady</u> requires the State to produce all evidence, not just exculpatory evidence.

Finally, <u>Brady</u> is inapplicable where the information at issue is known to the defendant. "[W]here the defendant was 'aware of the essential facts that would enable him to take advantage of the exculpatory evidence,' the government's failure to disclose it did not violate <u>Brady</u>." <u>Spirko v. Mitchell</u>, 368 F.3d 603, 610 (6th Cir. 2004) (quoting <u>United States v. Todd</u>, 920 F.2d 399, 405 (6th Cir. 1990)). Thus, when "the evidence was available to [a defendant] from other sources than the state, and he was aware of the essential facts necessary for him to obtain that evidence, the <u>Brady</u> rule does not apply." <u>Id.</u> at 611; <u>see also</u> <u>United States v. Bates</u>, No. 05-811027, 2007 WL 2156278, at *4-*6 (E.D. Mich. July 26, 2007). The box at issue was taken from Petitioner's van, and it held ammunition for Petitioner's .357 caliber weapon. Petitioner testified at trial that "I had a .357 in the van, and a 9-millimeter." (D.E. 10-4 at 68.) He stated that he normally had a pistol in his possession because he carried large sums of money from his business. (<u>Id.</u> at 76.) Petitioner admitted that the .357 was his, and he testified that Josh Garrett brought the 9-millimeter pistol with him that day. (<u>Id.</u> at 80-81, 82.) According to Petitioner, "[b]oth of the guns were laying in the floor when we

50

were riding." (Id. at 81; see also id. at 83.) It is undisputed that Petitioner shot the victim with a .357 caliber handgun. State v. Lovins, 2004 WL 224482, at *3. If the .357 handgun belonged to Petitioner, it is likely that the box containing the ammunition and gloves also belonged to him.

The fourth issue is without merit and is DISMISSED.

E.    Ineffective assistance of counsel (Claim 5)

In his fifth issue, Petitioner asserts that his attorney rendered ineffective assistance, in violation of the Sixth Amendment, by failing to challenge the application of enhancement factors that increased his sentence as violative of the Fifth, Sixth, and Fourteenth Amendments. (D.E. 1 at 21-24.) Respondent contends that this issue was not exhausted in state court and it is now barred by procedural default. (D.E. 17-1 at 15-17.)

As was discussed in connection with Claim 1, see supra pp. 25-30, trial counsel did not raise a Sixth Amendment issue at the sentencing hearing. At that time, the Supreme Court had decided Apprendi v. New Jersey, 530 U.S. 466 (2000), but had not issued its decision in Blakely. Even in his postconviction petition, which was filed after issuance of the decision in Blakely, Lovins raised no claim that trial counsel was ineffective for failing to object to the sentencing enhancements on Sixth Amendment grounds.[18] Because

---

[18]    The amended postconviction petition, which was filed by counsel, asserted that appellate counsel was ineffective for failing to challenge the enhancement factors, but it did not mention the Sixth Amendment and did not argue
(continued...)

there is no longer any means by which Petitioner can exhaust this issue in state court, the fifth claim is barred by procedural default. Petitioner cannot show cause for his procedural default because his postconviction petition was filed after the decision in Blakely.

Therefore, the fifth issue is DISMISSED.

The petition is DISMISSED WITH PREJUDICE. Judgment shall be entered for Respondent.

IV.  <u>APPEAL ISSUES</u>

The Court must also determine whether to issue a certificate of appealability ("COA"). The statute provides:

(1)  Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

    (A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

    (B)  the final order in a proceeding under section 2255.

(2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

---

[18]   (...continued)
that trial counsel was ineffective for failing to raise a constitutional challenge to any sentence enhancements. <u>See</u> <u>supra</u> p. 28.

The petition states that this issue was raised in the motion to recall the mandate and application for extraordinary review, but those documents presented only the substantive <u>Blakely</u> arguments and did not include an ineffective assistance claim.

(3)   The certificate of appealability under paragraph
(1) shall indicate which specific issue or issues
satisfy the showing required by paragraph (2).

28 U.S.C. § 2253(c); see also Fed. R. App. P. 22(b); Lyons v. Ohio
Adult Parole Auth., 105 F.3d 1063, 1073 (6th Cir. 1997) (district
judges may issue certificates of appealability). No § 2254
petitioner may appeal without this certificate.

In Slack v. McDaniel, 529 U.S. 473, 483-84 (2000), the
Supreme Court stated that § 2253 is a codification of the standard
announced in Barefoot v. Estelle, 463 U.S. 880, 893 (1983), which
requires a showing that "reasonable jurists could debate whether
(or, for that matter, agree that) the petition should have been
resolved in a different manner or that the issues presented were
"'adequate to deserve encouragement to proceed further.'" Slack,
529 U.S. at 484 (quoting Barefoot, 463 U.S. at 893 & n.4).

The Supreme Court has cautioned against undue limitations
on the issuance of certificates of appealability:

> [O]ur opinion in Slack held that a COA does not require
> a showing that the appeal will succeed. Accordingly, a
> court of appeals should not decline the application of a
> COA merely because it believes the applicant will not
> demonstrate an entitlement to relief. The holding in
> Slack would mean very little if appellate review were
> denied because the prisoner did not convince a judge, or,
> for that matter, three judges, that he or she would
> prevail. It is consistent with § 2253 that a COA will
> issue in some instances where there is no certainty of
> ultimate relief. After all, when a COA is sought, the
> whole premise is that the prisoner "'has already failed
> in that endeavor.'"

Miller-El v. Cockrell, 537 U.S. 322, 337 (2003) (quoting Barefoot,

463 U.S. at 893). Thus,

> A prisoner seeking a COA must prove "'something more
> than the absence of frivolity'" or the existence of mere
> "good faith" on his or her part. . . . We do not require
> petitioners to prove, before the issuance of a COA, that
> some jurists would grant the petition for habeas corpus.
> Indeed, a claim can be debatable even though every jurist
> of reason might agree, after the COA has been granted and
> the case has received full consideration, that petitioner
> will not prevail.

Id. at 338 (quoting Barefoot, 463 U.S. at 893); see also id. at 342

(cautioning courts against conflating their analysis of the merits

with the decision about whether to issue a COA; "The question is

the debatability of the underlying constitutional claim, not the

resolution of that debate.").[19]

In this case, there can be no question that the petition

is time barred and barred by procedural default. Because any appeal

by Petitioner on the issue raised in this petition does not deserve

attention, the Court DENIES a certificate of appealability.

The Sixth Circuit has held that the Prison Litigation

Reform Act of 1995, 28 U.S.C. § 1915(a)-(b), does not apply to

appeals of orders denying § 2254 petitions. Kincade v. Sparkman,

117 F.3d 949, 951 (6th Cir. 1997). To appeal in forma pauperis in

a habeas case, and thereby avoid the $455 appellate filing fee

required by 28 U.S.C. §§ 1913 and 1917, the prisoner must obtain

---

[19]     The Supreme Court also emphasized that "[o]ur holding should not be
misconstrued as directing that a COA always must issue." Id. at 337. Instead, the
COA requirement implements a system of "differential treatment of those appeals
deserving of attention from those that plainly do not." Id.

pauper status pursuant to Federal Rule of Appellate Procedure
24(a). <u>Kincade</u>, 117 F.3d at 952. Rule 24(a) provides that a party
seeking pauper status on appeal must first file a motion in the
district court, along with a supporting affidavit. Fed. R. App. P.
24(a)(1). However, Rule 24(a) also provides that if the district
court certifies that an appeal would not be taken in good faith, or
otherwise denies leave to appeal <u>in forma pauperis</u>, the prisoner
must file his motion to proceed <u>in forma pauperis</u> in the appellate
court. <u>See</u> Fed. R. App. P. 24(a) (4)-(5).

In this case, for the same reasons the Court denies a
certificate of appealability, the Court determines that any appeal
would not be taken in good faith. It is therefore CERTIFIED,
pursuant to Fed. R. App. P. 24(a), that any appeal in this matter
would not be taken in good faith, and leave to appeal <u>in forma
pauperis</u> is DENIED. If Petitioner files a notice of appeal, he must
also pay the full $455 appellate filing fee or file a motion to
proceed <u>in forma pauperis</u> and supporting affidavit in the Sixth
Circuit Court of Appeals within thirty (30) days of the date of
entry of this order.

IT IS SO ORDERED this_29th_day of March, 2011.


s/ JON PHIPPS McCALLA
JON PHIPPS McCALLA
UNITED STATES DISTRICT JUDGE